Filed 1/11/24  P. v. Stewart CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


THE PEOPLE,

    Plaintiff and Respondent,

v.

TRAEVON DENAE STEWART,

    Defendant and Appellant.

E081464

(Super.Ct.No. BAF1700447)

OPINION


APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.  Affirmed.

Randi Covin, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

1

## STATEMENT OF THE CASE

On October 8, 2019, a second amended information charged defendant and appellant Traevon Denae Stewart with murder under Penal Code section 187 (count 1); attempted robbery under Penal Code sections 664 and 211 (count 2); kidnapping under Penal Code section 207, subdivision (a) (count 3); assault with a semiautomatic firearm under Penal Code section 245, subdivision (b) (count 4); evading a peace officer under Vehicle Code section 2800.2 (count 5); dissuading a witness, John Doe, under Penal Code section 136.1, subdivisions (b)(1) and (c)(1) (count 6); criminal threat, threaten John Doe under Penal Code section 422 (count 7); and dissuading a witness—Jane Doe under Penal Code section 136.1, subdivisions (b)(1) and (c)(1) (count 8).

The information also alleged that as to count 1, the murder was committed in the commission or attempted commission of robbery and kidnapping (Pen. Code,[1] § 190.2, subds. (a)(17(A) & (a)(17)(B)); as to counts 1 and 2, defendant personally discharged a firearm causing death (§ 12022.53, subd. (d)); as to count 3, defendant personally used a firearm (§§ 12022.53, subd. (b), 1192.7, subd. (c)(8)); and as to count 4, defendant personally used a semi-automatic handgun (§ 12022.5, subd. (a)).

Furthermore, the information alleged four prior prison terms (§ 667.5, subd. (b)) and two prior serious or violent felony convictions (§§ 667, subds. (b)-(i), 1170.12, subd. (c)(2)(A)).

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Defendant's jury trial commenced on October 15, 2019.  On October 18, 2019, the trial court dismissed count 7 (criminal threat) pursuant to a motion by the prosecutor.  On October 22, 2019, the jury found defendant guilty of the remaining counts:  first degree murder (count 1); attempted robbery (count 2); kidnapping (count 3); assault with a semiautomatic firearm (count 4); evading a peace officer (count 5); and dissuading two witnesses (counts 6 & 8).  The jury also found true felony-murder special circumstance, firearm enhancement, and prior conviction allegations.

The court then imposed an aggregate sentence of four years plus 100 years to life, plus life without the possibility of parole.  On the same day, defendant filed a notice of appeal.

In an unpublished opinion on March 16, 2022, this court reversed defendant's sentence.  We directed the trial court "to resentence defendant, exercising the discretion conferred by the recent amendments to section 654." (*People v. Stewart* (Mar. 16, 2022, E074335) [nonpub. opn.] *56.)[2]  Moreover, we ordered:  "Regardless of whether the trial court changes defendant's sentence upon resentencing, because the prior sentence has been reversed, the trial court is directed to issue an amended abstract of judgment." (*Id.* at *56-*57.)  We affirmed the judgment in all other respects. (*Id.* at *57.)

At the resentencing hearing on April 14, 2023, defense counsel and the prosecutor were present.  The court stated:  "We're here today for resentencing.  This matter was returned to the trial court based on a change in the law that allows the Court to impose a sentence lower than what was originally required under the law."  Upon invitation by the

---

[2]  On September 12, 2023, we granted defendant's motion to take judicial notice of the record in case No. E074335.

court to speak, the prosecutor stated: "Obviously the change in the law under Penal Code Section 654 says the Court has discretion; however, it's not mandatory that the Court impose the lower sentence." The prosecutor then went on the discuss the seriousness of defendant's crimes. Defense counsel then spoke and asked "the Court to impose the lesser sentence. The [indeterminate] term would still be quite a harsh punishment rather than the LWOP sentence. So I would ask the Court to exercise that discretion and sentence him to the [indeterminate] term of 25 to life."

The trial court stated: "The Court recognizes that I do have the discretion to impose a lesser sentence on [defendant], and I've thought about this case numerous times since it's been returned to this department for review. And I've had a chance once again to reflect on the evidence as was presented in the trial in front of me." The court went on to state: "This was one of the more serious cases that I've tried in my 14 years as judge in terms of the emotional impact on the victim prior to her death; that she was dragged from her home, she was—gunshots were fired inside the home prior to her being kidnapped, wounding her; that she was then taken by car in order to try to scare her and threaten her into giving up the  money that [defendant] thought she had that she had wrongfully taken from another individual; and that when she did not turn over the money, she was shot, murdered, callously and in cold blood; and then there [were] actions taken by [defendant] to intimidate witnesses so they would not disclose what information they had about him and about the killing. [¶] So this is a case in which the Court will not exercise discretion and will not lower the defendant's sentence that was previously imposed on December 13th of 2019."

4

Thereafter, after stating, "[h]aving weighed all the factors in aggravation versus the factors in mitigation, the Court imposes the sentence as follows," the court imposed the same sentence as the initial sentence, except for imposing the four-year determinate sentence in count 5 concurrently, instead of consecutively, for a total of 10 years, plus 100 years to life, plus life without possibility of parole.

On June 6, 2023, defendant filed a timely notice of appeal.

## STATEMENT OF FACTS[3]

"A.    MURDER, KIDNAPPING, AND ATTEMPTED ROBBERY

"Michael Wayne Bird was 63 years old in April 2017.  Bird receives approximately $4,400 per month from social security and two pensions.  Bird was homeless; he abused drugs and alcohol and tended to spend all of his money shortly after receiving it.  In approximately 2012, Bird met Latoya Calhoun (the victim) and her girlfriend, Shayona (Girlfriend).  Bird allowed the victim to manage approximately half of his money for him so that he would not immediately spend the entire amount and thus have money for later in the month.

"In 2016, Bird met defendant, who was Girlfriend's cousin.  Defendant wanted to manage Bird's money.  One month, Bird gave defendant Bird's money to manage, but defendant kept the money and did not distribute it to Bird.  One day, defendant left approximately $700 of Bird's money by a bathroom sink while defendant showered.

---

[3]  The statement of facts is taken from this court's unpublished opinion in *People v. Stewart*, *supra*, E074335.

5

Bird took the $700. Defendant accused Bird of stealing from him and said Bird owed defendant $700.

"In April 2017, defendant increasingly demanded that Bird pay him. Defendant threatened Bird's life while demanding payment. An unidentified person told defendant that the victim had a $1,049 check for Bird. Defendant threatened to 'shoot [the victim] in the face over [Bird's] money.' The victim was scared of defendant.

"Defendant and Bird drove to the victim's apartment. The victim reached into her pocket for the check, in order to give it to defendant, but the check was not there. Bird believed Girlfriend took the check from the victim. On that occasion, defendant was polite with the victim because 'the real gangsters [were] in the neighborhood.'

"Several days later, around noon on April 28, 2017, the victim communicated with Bird regarding her anxiety about defendant's threat to shoot her in the face. Later that same day, at approximately 8:30 p.m., the victim called her mother and said that defendant threatened 'to shoot her in the face.'

"Also on the night of April 28, 2017, Bird was sitting in the van of Ugochukwu Okoro, in a parking lot. Defendant arrived, held a gun to Bird's head, and threatened to kill Bird if Bird did not pay defendant. Okoro offered defendant $40 in order to calm defendant, but Okoro did not have the money with him. Okoro and Bird drove to Okoro's home to get Okoro's ATM card, and defendant followed. The three men went to an ATM machine where Okoro withdrew money, and he gave defendant $40.

"Defendant still wanted the check that the victim had previously been holding for Bird. Defendant instructed Bird to get in defendant's car, which Bird did. Defendant

6

drove to the victim's apartment, in Hemet. The victim lived with Girlfriend, Roger Rook, three other adults, and some teenagers. Upon exiting the vehicle, defendant walked with Bird to the victim's apartment. When knocking on the door of the apartment, defendant held the gun to Bird's head. Bird opened the apartment door, and he and defendant stepped inside.

"The victim was in a bedroom on a lounge chair. Defendant stood over the victim, pointed the gun at her face, and said ' "I want my fucking money." ' Defendant fired the gun twice, shooting the victim in the foot. The victim screamed and urinated on herself. Defendant forced the victim to stand and then defendant, Bird, and the victim exited the apartment.

"Defendant instructed Bird to retrieve the car, which Bird did. In the meantime, defendant and the victim went to another apartment, where a person named Sleeps lived. Defendant and the victim exited Sleeps's apartment. The victim was carrying a stack of mail.

"The victim was crying, screaming, and did not want to get into defendant's car, but she ultimately did. Defendant drove the car; Bird was in the front passenger seat; and the victim was in the backseat on the passenger side. Defendant drove with his left hand on the steering wheel and his right arm extended behind the front passenger seat, with the gun pointed at the victim.

"Defendant 'zigzagged' through various streets, avoiding the police who were 'all over th[e] place.' The victim was 'freaking out' and rifling through the stack of mail that was 'all over the backseat.' Defendant instructed Bird to 'look for something,' in the

7

stack of mail. Bird turned around and leaned toward the backseat, to look through the mail. Bird did not know what he was looking for, so he ultimately turned back around facing forward. Bird assumed the mail had something to do with the check, but it was not clear to him.

"As the car traveled down Esplanade Avenue, in Hemet, the victim opened the car door to jump out. Bird assumed the victim was trying to leave the car before she was shot. However, nearly instantaneous to the door being opened, defendant fired three shots at the victim in rapid succession. The victim suffered a fatal gunshot to the back of her neck. The victim fell or jumped out of the car. The victim landed face-up in a ditch along Esplanade.

"Defendant took his hand off the steering wheel, reached back, and shut the car door. Defendant continued driving. He drove to Okoro's house, which is behind a fence, in order to hide the vehicle in which the victim was shot. They arrived at Okoro's house at approximately 2:00 a.m. on April 29, 2017. Bird told Okoro about the killing. Okoro did not permit defendant to hide the vehicle at his house. Defendant drove away, and Bird walked away from Okoro's house.

"At approximately 5:58 a.m. on April 29, 2017, two people in a vehicle on Esplanade contacted police about the victim's body. The victim had gunshot wounds on the back of her neck, the right side of her lower back, her left calf, and her left foot.

"B.    FLEEING POLICE

"A 'be on the lookout' alert was issued to law enforcement officers regarding defendant's mother's car, which was the vehicle in which the victim was shot. City of

8

Banning Police Officer Campa saw the car at 12:15 a.m. on May 1, 2017. Officer Campa activated his vehicle's overhead lights and sirens. Defendant stopped his vehicle along the side of the road. Five to 10 times, Officer Campa directed defendant to turn off the vehicle, place the keys on the car's roof, and raise his hands.

"Defendant did not comply. Instead, defendant 'kept reaching down in the lower right floorboard of the vehicle. Kept saying, ' "Why? Why? What did I do?" ' Then defendant drove away. Officer Campa pursued defendant. Defendant and Campa drove at approximately 75 miles an hour, in areas with speed limits of 35 and 45 miles an hour, and did not stop at stop signs. Defendant jumped out of his mother's car while it was moving. Approximately one hour and 40 minutes later, defendant surrendered and was arrested.

"C.    DEFENDANT'S STATEMENT

"Defendant spoke with Riverside County Sheriff's investigators after being arrested. During the police interview, defendant said, 'I do a lot of drugs' and 'Like I said, I do a lot of drugs.' Investigator Stoyer asked if defendant consumed drugs on Friday when defendant went to the victim's apartment. Defendant replied, 'Of course.' When asked about the type of drugs he abused, defendant said, 'I smoke sherm and, uh crystal meth.' Defendant also said he takes pills for pain.

"Investigator Stoyer asked defendant if an argument occurred on Friday night. Defendant replied, 'I be so high and drugged up, I don't know.' Defendant went on to discuss his recollection of the events of Friday night. According to defendant, Bird owed defendant $1,400 for the money that Bird stole from defendant and the drugs and alcohol

9

that defendant purchased for Bird. The victim said she would give defendant the money that Bird owed defendant, but the victim never gave defendant the money. Defendant explained that the victim and Girlfriend would beat Bird, give Bird drugs, and/or prostitute themselves with Bird in order to keep Bird's money.

"Bird told defendant that Girlfriend took the check that defendant wanted. On the night of April 28, 2017, defendant and Bird went to the victim's and Girlfriend's apartment. The victim said Girlfriend had the money, but Girlfriend denied that allegation. Defendant shot the victim's foot. The victim urinated on herself. The victim rifled through papers and then said, ' "I got it." ' Defendant said, ' "Show me, show me, show me." ' Another person said they had about 90 seconds until the police arrived at the apartment.

"The victim said the check was at Sleeps's apartment. Defendant and the victim went to Sleeps's apartment, and Bird brought the car around. Defendant and the victim left Sleeps's apartment with mail and entered the car. Defendant was driving, and the victim was in the backseat on the passenger side. While driving down various streets, the victim was searching through the stack of mail.

"The victim did not have Bird's check. The victim was scared, and then she jumped out of the car while it was moving. Defendant said, 'So, whatever happened to her when she got out of my car, I don't know.' After the victim jumped out of the car, defendant and Bird went to Okoro's house. Defendant then went to his mother's house where he cried. Investigator Stoyer asked defendant why defendant shot the victim inside the car. Defendant said he did not recall shooting the victim inside the car.

10

"Investigator Dickey asked what happened to the gun after the shooting in the apartment.  Defendant said he put the gun in the car's center console upon entering the car with Bird and the victim.  Defendant said that, while driving in the car with Bird and the victim, defendant realized that the situation 'went too far' because the police had been called due to the shooting in the apartment.  The following exchange occurred between defendant and Investigator Dickey:

'Defendant:  'So I told [Bird], "No, motherfucker, you do it."

'Dickey:  You do what?

'[Defendant]:  'You shoot her.'

'Dickey:  Shoot who?

'[Defendant]:  [The victim].

'Dickey:  In the car?

'[Defendant]:  Yeah, so I gave [Bird] the gun, [Bird] sat up on his knees and got behind the seat and he was like, " 'Give me the fuckin' check . . . .  Give me the check." '  And she wouldn't give him the check at all.  Just adamant about—"Just give him the fuckin' check."  I'm tryin' to tell her, "Why don't you just fuckin' give it to him?  It ain't yours, it's his.  Give it to him."  I never seen him shoot, nothin'.  All I heard was the shots and that's when I motherfucking looked back and she was already jumpin' out of the car.  Already.  Instantly.  Soon as I heard the bow, that was the first one.  I guess that's because she just did it on him.  'Cause I never seen her do it.  When I looked back, she was—all I can see was her body goin' out.  I didn't see her open the door, I didn't see none of that part.  All I seen was her going out of the car.'

11

"Dickey asked why Bird would shoot the victim, rather than shoot defendant. Defendant said Bird did not want to shoot the victim. Dickey asked why defendant did not go back at some point to check on the victim. Defendant replied, 'I didn't care. I didn't wanna—I didn't care whether she was—I was kinda mad.' Dickey asked defendant where to find the gun. Defendant said, 'I don't know where they put it but I know where it's at.'

"D. POLICE INVESTIGATION

"The gun was never recovered. Gunshot residue would not transfer from the shooter's hand to the steering wheel or door handle because gunshot residue is fragile. If a gun is fired in a vehicle, the gunshot residue could move as a cloud and permeate throughout the vehicle.

"E. DISSUADING OKORO

"After the incidents in this case occurred, Okoro was arrested and jailed for an unrelated matter. Okoro was subpoenaed to testify in the preliminary hearing in defendant's case. In November 2018, Okoro was transported by bus from the jail in Banning to the courthouse in Riverside. Defendant, who was also in custody, was on the same bus as Okoro. Defendant said to Okoro, ' "I'm going to send someone to kill you." ' Okoro feared for his life. Okoro testified at defendant's preliminary hearing. Upon returning to jail, Okoro was physically attacked. Okoro was then moved into protective custody. Upon being released from jail, Okoro was scared to be at home, so he moved to another city.

"F.  DISSUADING C.R.

"C.R. dated defendant '[o]ff and on for about ten years,' and they occasionally lived together.  C.R. had a son, A.R.  A.R.'s age in 2017 is unclear from the record, but it can be inferred that he was likely in his twenties.  On April 7, 2017, at approximately 10:30 p.m., C.R., A.R., and defendant were at a convenience store.

"A.R. and defendant argued and stood 'chest to chest.'  Defendant asked A.R. if A.R. was scared and if he wanted defendant 'to kick his ass.'  A.R. looked scared.  C.R. asked the store clerk to call the police.  Defendant told C.R. 'that he was gonna break her of that habit and if she called the police, that he was going to kill her.'  C.R. told defendant to leave A.R. alone.

"C.R. went to the Banning police station to report defendant's threats.  C.R. said she feared defendant because, in the past, he physically and mentally abused her.  C.R. told the police that she feared defendant would kill her.  Part of C.R.'s fear was caused by her knowledge that defendant carried a handgun." (*People v. Stewart*, *supra*, E074335 *3-*12.)

**DISCUSSION**

After defendant appealed, and upon his request, this court appointed counsel to represent him.

On August 28, 2023, appellate counsel filed a brief under *People v. Wende* (1979) 25 Cal.3d 436.  In the brief, however, defense counsel also cited to *People v. Delgadillo* (2022) 14 Cal.5th 216, when requesting this court to "independently review the record on

13

appeal when a no-issues brief is filed. (*Wende*, at pp. 441-442; cf. . . . *Delgadillo*[, at pp.] 226-231."

On August 29, 2023, we sent an order to defendant, stating:

"Counsel for appellant has filed a brief stating no arguable issues can be found. Because this is an appeal from the denial of a post-conviction proceeding, this court is not required to conduct an independent review of the record but may do so in its discretion. (*People v. Delgadillo* (2022) 14 Ca1.5th 216 . . . ; *People v. Serrano* (2012) 211 Ca1.App.4th 496.) The appellant is personally granted 30 days to file any supplemental brief deemed necessary. If appellant files a supplemental brief, this court will evaluate the specific arguments presented in that brief in its opinion. (*Delgadillo*, . . . at p. 165) Failure to timely file a supplemental brief may result in the dismissal of the appeal as abandoned."

On October 16, 2023, we granted appellate counsel's "unopposed application filed September 5, 2023, for leave to file a supplemental appellant's opening brief."

On October 16, 2023, appellate counsel filed defendant's supplemental opening brief. In the brief, appellate counsel argued that since defendant's appeal is "from the new judgement," it is "not a collateral attack on a final judgment and *Delgadillo* does not apply," and requested that "the Court independently review the record and determine for itself whether any arguable issues require briefing."

In defendant's original brief, appellate counsel set forth a statement of the case and a summary of the facts. As to a list of potential arguable issues, however, appellate counsel provided: "[C]ounsel has carefully evaluated the record and has concluded such

14

a list would not be beneficial in this case. To assist the court in its review of the record, counsel has written a thorough summary of the trial court proceedings."

After appellate counsel filed a brief under *People v. Wende*, we offered defendant an opportunity to file a personal supplemental brief, and he has not done so.

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error. We are satisfied that defendant's attorney has fully complied with the responsibilities of counsel and no arguable issue exists. (*Id.* at p. 126; *Wende*, *supra*, 25 Cal.3d at pp. 441-442.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

FIELDS
J.

RAPHAEL
J.